IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| In the Matter of | CIVIL NO. 12-00612 DKW-RLP |
| Matthew O., by and through his Parent, David O., | **ORDER AFFIRMING THE ADMINISTRATIVE HEARINGS OFFICER'S OCTOBER 26, 2012 DECISION** |
| Plaintiffs, | |
| vs. | |
| DEPARTMENT OF EDUCATION, STATE OF HAWAII, | |
| Defendant. | |

**ORDER AFFIRMING THE ADMINISTRATIVE HEARINGS OFFICER'S OCTOBER 26, 2012 DECISION**

**INTRODUCTION**

Before the Court is Plaintiffs Matthew O. ("Student"), by and through

his Parent, David O.'s ("Father") (collectively, "Plaintiffs") appeal, pursuant to the

Individuals with Disabilities Education Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et*

*seq*., from the Administrative Hearings Officer's ("Hearings Officer") October 26,

2012 Findings of Fact, Conclusions of Law, and Decision ("Decision").  On

September 6, 2013, the Court heard oral arguments on the appeal.  After careful

consideration of the supporting and opposing memoranda, the administrative

record, and the arguments of counsel, the October 26, 2012 Decision is
AFFIRMED.

## **BACKGROUND**

Student has autism, was 14, and was in the eighth grade at the time of
the Due Process Hearing in 2012.  Student has attended Variety School of Hawaii
("Variety"), a small private school specializing in students with autism, ADD and
other learning disabilities, since he was in first grade.  Variety provides an
individualized program for its students, but does not have a community-based
instructional ("CBI") program and does not provide its students with opportunities
to work or study alongside typically-developing peers.  The Department of
Education, State of Hawai'i ("DOE"), has been paying for Student's attendance at
Variety since the 2006-2007 school year (Student's second grade year) via
settlement or other agreements.  Decision at 3 ¶¶ 1, 3–5, 7.  Student's DOE home
school at the time of the Due Process Hearing was Ilima Intermediate located in
Ewa Beach.  His present home school is Campbell High School.

This appeal centers on Student's December 9, 2011 Individualized
Education Program ("December IEP") and a transition plan for Student that was
developed beginning with Student's April 7, 2011 IEP meeting.  In Student's April
7, 2011 IEP ("April IEP"), the IEP team changed Student's placement from
Variety to his DOE home school, Ilima.  *Compare* Resp. Ex. 4 (April 20, 2010

2

IEP) at 000053 (placing Student at Variety) *with* Resp. Ex. 5 (April 7, 2011 IEP) at 000069 (placing Student at Ilima).  The IEP team thus began to develop a transition plan.  The Hearings Officer made the following findings regarding the transition plan:

> The private school director was at Student's April 7, 2011 IEP meeting.  During the April 7, 2011 IEP meeting, Student's IEP team discussed transitioning Student from the private school to the home school.  According to the private school director, although the DOE wanted this transition, neither the private school nor parents wanted to transition Student.  The private school director testified that Student still needed the small environment that the private school offered, as well as other students closer to Student's ability level.
>
> However, Father clarified that, at the April 7, 2011 IEP meeting, he agreed to go along with the transition.
>
> A transition plan was developed to transition Student from the private school to the home school starting from the April 7, 2011 IEP meeting and continuing through the summer of 2011.
>
> The DOE special education teacher had observed Student at the private school 4 times prior to attending the April 7, 2011 IEP meeting.  The special education teacher testified that the transition plan was slow, methodical, and appropriate.  The transition plan addressed Student's anxiety.
>
> . . .
>
> The early stages of the transition plan called for Student to participate in CBI activities, along with his long-time skills trainer and with the DOE's special education teacher and her home school students.
>
> . . .

3

> The [Autism Consultant Teacher ("ACT")] opined that the transition plan was appropriate for Student as it involved a thoughtful, gradual, low-impact transition from the private school to the home school over several months with familiar people working with Student. . . . the ACT testified that there was no reason Student could not transition to the home school as he had the prerequisite skills to do so.

> . . .

> Monthly transition meetings were held for Student between June and December 2011.  The private school director testified that she constantly discussed Student's behaviors at these transition meetings.  However, the private school director admitted that she had not provided Student with direct services and obtained her information about Student from his private school teachers.

> Father added that at the monthly transition meetings, he brought up Student's behaviors.  The special education teacher testified that the DOE considered the potential harmful effects of Student transferring to the home school.  To help the transition process, the DOE made the process gradual, with supports such as role playing, learning to meet new people, and updating Student's behavioral support plan ("BSP").

Decision at 4–6 ¶¶ 13–16, 19, 22, 34–35.

On December 9, 2011, another IEP meeting was held and the December IEP was drafted.  Relevant here, the December IEP provided Student with special education, occupational therapy, speech and language therapy, as well as a variety of other supplementary aids and services, program modifications, and supports.  Resp. Ex. 9 (December IEP) at 000140.  The Present Levels of Educational Performance ("PLEPS") section of the December IEP addressed

4

assessments of Student in reading, writing, math, behavior, daily living skills, speech-language/communication skills, and occupational therapy, and addressed reports from Parents. *Id.* at 000126–28. The information for the PLEPS came from a variety of sources, including, among others: Variety's progress reports for Student, including the most recent quarterly progress reports for the 2011–2012 school year, Resp. Ex. 19 (Variety progress reports) at 000231–238, an emotional behavior assessment ("EBA") of Student done by DOE clinical psychologist Dr. Post right before the December 9 IEP meeting, Resp. Ex. 20 (EBA assessment) at 000291–96, and a neuropsychological evaluation by Parents' psychologist, Dr. Tyson, Resp. Ex. 20 (Neuropsychological Evaluation-Update) at 000252–62.

The December IEP also enumerated annual measurable goals in the areas of reading comprehension, reading fluency, writing, math-measurement, math-numbers and operations, oral communication, self-managing behaviors, daily living skills, and interpersonal communication. Resp. Ex. 9 (December IEP) at 130–39.

In terms of Student's mainstreaming placement, the December IEP established that "[Student] will not participate with nondisabled peers for core academic classes, one elective, lunch field trips, and assemblies. He will participate with nondisabled peers for one elective and recess." *Id.* at 000141.

At the December 9, 2011 meeting, the IEP team also updated the transition plan that had been in progress since the April IEP.  The transition update provided that Student would begin attending half-days at Ilima beginning on December 13 and would then begin attending full days starting the week of December 20, which was Christmas break for students not on an extended school year.  Hrg. Tr. Vol. 2 at 435:2–436:17.  However, Parents stated that they did not want Student to continue the transition to Ilima, resulting in Student never attending classes there.  Decision at 11 ¶ 73.

On December 22, 2011, Father submitted a Request for Due Process Hearing, which was amended on March 29, 2012.  Resp. Ex. 1 (Amended Due Process Request) at 000003–05.  On October 26, 2012, the Hearings Officer issued his Decision after holding a due process hearing on August 21–24, 2012.  The Hearings Officer concluded that the December IEP did not deny Student a free and appropriate public education because, among other things:  "[t]he PLEPS in the December 9, 2011 IEP describe Student at the time the IEP was created" and the Plaintiffs failed to show that the DOE did not properly assess Student in all appropriate areas; the DOE did not predetermine placement and the "offer of placement at the home school was made after a thoughtful, gradual, low-impact transition from the private school to the home school over several months with

familiar people working with Student"; and the December IEP placed Student in the least restrictive environment.  Decision at 13–20.

Plaintiffs' subsequent appeal of that Decision is presently before the Court.

## STANDARD OF REVIEW

### I.   IDEA Overview

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs."  *Hoeft ex rel. Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)).  It ensures that "all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]"  20 U.S.C. § 1400(d)(1)(A).  The IDEA defines FAPE as special education and related services that—

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

7

20 U.S.C. § 1401(9).  To provide a FAPE in compliance with the IDEA, a state

educational agency receiving federal funds must evaluate a student, determine

whether that student is eligible for special education, and formulate and implement

an IEP.  20 U.S.C. § 1414.  The IEP is to be developed by an "IEP Team"

composed of, *inter alia*, school officials, parents, teachers and other persons

knowledgeable about the child.  20 U.S.C. § 1414(d)(1)(B).

"Procedural flaws in the IEP process do not always amount to the

denial of a FAPE."  *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th

Cir. 2009) (citations omitted).  Once a procedural violation of the IDEA is

identified, the court "must determine whether that violation affected the

substantive rights of the parent or child."  *Id.* (citations omitted).  "[P]rocedural

inadequacies that result in the loss of educational opportunity, or seriously infringe

the parents' opportunity to participate in the IEP formulation process, clearly result

in the denial of a FAPE."  *Id.* (alteration in original) (citations and quotation marks

omitted).

Compliance with the IDEA does not require school districts to provide

the "absolutely best" or "potential-maximizing" education.  *J.W. v. Fresno Unified

Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks

omitted).  Rather, school districts are required to provide only a "'basic floor of

opportunity.'"  *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v.*

*Rowley*, 458 U.S. 176, 201 (1982)).  The FAPE need only be "appropriately designed and implemented so as to convey [the][s]tudent with a meaningful benefit."  *Id.* at 433 (citations and quotation marks omitted).

## II.   **Standard of Review**

The standard for district court review of an administrative decision under the IDEA is set forth in 20 U.S.C. § 1415(i)(2)(C), which provides:

In any action brought under this paragraph, the court—

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that the district court give "'due weight'" to the administrative proceedings.  *Capistrano*, 556 F.3d at 908 (quoting *Rowley*, 458 U.S. at 206) (some citations omitted).  The district court, however, has the discretion to determine the amount of deference it will accord the administrative ruling.  *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010) (citing *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)).  In reaching that determination, the court should consider the thoroughness of the hearings officer's findings, increasing the degree of deference where said findings are "'thorough and careful.'"  *Capistrano*, 556 F.3d at 908 (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)).

The district court should give "substantial weight" to the hearings officer's decision when the decision "evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented." *Cnty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466–67 (9th Cir. 1996) (citation and quotation marks omitted).  Such deference is appropriate because "if the district court tried the case anew, the work of the hearing officer would not receive 'due weight,' and would be largely wasted." *Wartenberg*, 59 F.3d at 891.  "[T]he ultimate determination of whether an IEP was appropriate," however, "is reviewed de novo." *A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 778 (9th Cir. 2010) (citing *Wartenberg*, 59 F.3d at 891).

A court's inquiry in reviewing IDEA administrative decisions is twofold:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  [*Rowley*, 458 U.S. at 206–07] (footnotes omitted).  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.  *Id.* at 207.

*J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (9th Cir. 2010) (some citations omitted).

The burden of proof in IDEA appeal proceedings is on the party challenging the administrative ruling. *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1103 (9th Cir. 2007) (citations omitted). The challenging party must show, by a preponderance of the evidence, that the hearing decision should be reversed. *J.W.*, 626 F.3d at 438 (citation omitted).

## DISCUSSION

Plaintiffs assert that the Hearings Officer was incorrect in concluding that the December IEP did not deny Student a FAPE. Specifically, Plaintiffs contend that the Decision erroneously determined that: (1) Plaintiffs failed to prove that the December IEP met Student's needs; (2) Plaintiffs failed to prove that the DOE violated the principles regarding placement in the least restrictive environment; and (3) Plaintiffs failed to prove that the DOE predetermined placement and improperly transitioned Student to Ilima. *See* Opening Br. at 2. The Court concludes that Plaintiffs have not satisfied their burden of showing that the Decision should be reversed for any of the aforementioned reasons and therefore affirms the Decision. Each of Plaintiffs' contentions on appeal is discussed in turn below.

## I.    The December IEP Addressed Student's Needs

Plaintiffs contend that the PLEPS section of the December IEP fails to specifically describe and set forth Student's present achievement levels, needs, and

measurable goals.  The DOE counters that the PLEPS were developed using the

most current information, assessments, and data available on Student and provide

an accurate and thorough description of Student's achievements, needs, and goals.

The Court agrees with the DOE.

An IEP is required to have, among other things:  "[a] statement of the

child's present levels of academic achievement and functional performance"; "[a]

statement of measurable annual goals, including academic and functional goals";

and "[a] description of . . . [h]ow the child's progress toward meeting the annual

goals . . . will be measured . . . and . . . [w]hen periodic reports on the progress the

child is making toward meeting the annual goals . . . will be provided."  34 C.F.R.

§ 300.320(a)(1)–(3).

The Hearings Officer correctly determined that the PLEPS in the

December IEP sufficiently state Student's present level of achievement and

performance.  Decision at 16.  The PLEPS adequately detail Student's present

levels of educational performance, needs, and strengths in the areas of reading,

writing, math, behavior, daily living skills, speech-language/communication, and

occupational therapy.  Resp. Ex. 9 (December IEP) at 000126–28.  For example,

the PLEPS describe one of Student's behavioral needs as needing to "verbalize

when feeling uncomfortable in certain situations" and needing to "utilize

appropriate coping skill[s]."  *Id.* at 127.  Although Plaintiffs contend that this

description is insufficient because it does not list the specific behaviors that were of concern to Parents (*e.g.*, bed-wetting/soiling or clingy behavior), the Court determines that the PLEPS sufficiently address the need to work on coping with anxiety in certain situations, including behaviors that Student was presently manifesting. *See* Hearing Tr. Vol. 3 at 530:17–531:19.  The PLEPS addressed Student's present level of behavioral needs and the IEP established an objective/strategy to address that need.  Resp. Ex. 9 (December IEP) at 000135 (laying out the short-term objectives to learn to cope with anxiety).  It was unnecessary to enumerate each specific behavior that Student was exhibiting as a consequence of his anxiety.

     As another example, the PLEPS delineate eight different reading strengths, including Student's ability to "answer basic comprehension questions (i.e., who, what, where, when, why, how)" and his ability to "decode words at an upper third grade to fourth grade level."  *Id.* at 000126.  The IEP then establishes correlating annual goals to "improve [] reading comprehension from second to third grade level" and "improve [] reading fluency skills from upper third to fifth grade level," and lays out 3 specific interim objectives for each of those annual goals.  *Id.* at 000130, 131.  Contrary to Plaintiffs' contention that these descriptions are unclear, the PLEPS define specific areas of strength and need, and the IEP develops goals to address each one.  Additionally, the Court finds no merit to

Plaintiffs' argument that the reading comprehension goal (*i.e.*, that Student improve from second to third grade level) is inconsistent with the PLEPS description that Student could "decode words at an upper third grade to fourth grade level." *Id.* at 000126.  Decoding and reading comprehension are different skills, and the IEP provided a separate annual goal related to decoding (*i.e.*, that Student would be able to improve from upper third to fifth grade level).  *Id.* at 000131; *see* Hearing Tr. Vol. 2 at 365:18–366:9 (testimony of the DOE special education teacher explaining that decoding skills and comprehension skills are completely different, and articulating the reason for Student's differing levels and goals for each).

Also, although Plaintiffs appear to criticize the DOE for largely utilizing and incorporating Variety's school progress reports in developing the PLEPS, that is consistent with what one would expect, given that Variety is the only school Student has attended since the first grade.  Indeed, it would be curious if the DOE elected not to use Variety's progress reports as an important resource for information on Student's strengths and needs.

Moreover, as reflected in the IEP, Variety's progress reports were just one source of information used in developing Student's goals and objectives.  Resp. Ex. 9 (December IEP) at 000126.  The IEP team also relied on information from, among other places, the EBA prepared by Dr. Post, the neurological

evaluation prepared by Dr. Tyson, the suggestions and input of both Parents who attended the IEP meeting, and the input of all other members of the IEP team. *See e.g.*, Resp. Ex. 19 (Variety progress reports) at 000231–238; Resp. Ex. 20 (EBA assessment) at 000291–96; Resp. Ex. 20 (Neuropsychological Evaluation-Update) at 000252–62.   Based on these varied sources, the December IEP appropriately identified and stated Student's levels of performance, needs, and strengths, and Plaintiffs attempt to show otherwise is unavailing.

In addition, the Court has reviewed the testimony in the record and the relevant portions of the IEP and rejects Plaintiffs' claim that Student's goals, as reflected in the December IEP, are not specific and too general.  The goals and benchmarks are specific, capable of measurement and directly relate to Student's focus areas, as identified in the PLEPS.  For example, for writing conventions and skills, the IEP provides an annual goal that Student "will improve on his ability to complete independent writing pieces that follow the rules of conventions with 80% accuracy in 4 out of 5 opportunities."  Resp. Ex. 9 (December IEP) at 000132.  The IEP then lays out 5 very specific benchmarks and short-term objectives (with subparts) to help Student attain that annual goal.  *Id.*  For reading comprehension, the IEP provides an annual goal for Student to "improve his reading comprehension from second to third grade level," enumerates methods to assess progress toward that goal, and sets forth 3 specific interim objectives in working toward that goal.

*Id.* at 000130.   These are the exact types of goals and measurement devices that are contemplated by the IDEA.  Plaintiffs have failed to show that these goals are insufficient and have failed to specifically identify what additional detail the IDEA requires.

The Court notes, and the DOE admits, that the IEP does not explicitly indicate "[w]hen periodic reports on the progress the child is making toward meeting the annual goals . . . will be provided."  34 C.F.R. § 300.320(a)(3)(ii).  As the DOE points out, however, Plaintiffs were well aware of the reporting system in place, where the DOE provided its reports to Parents on a quarterly basis, as that had been the practice in place for several years while Student was attending Variety.  *See* Resp. Ex. 19 (IEP Progress Reports).  To the extent that a failure to explicitly state the period in which progress reports would be provided is a violation of the IDEA, the Court concludes that it is a *de minimis* procedural violation that did not result in the loss of educational opportunity or infringe on Parents' opportunity to participate in the IEP process.

## II.   The DOE Did Not Violate the Least Restrictive Environment ("LRE") Requirements

Plaintiffs contend that the Decision should be reversed because the DOE did not place Student in the LRE.  Decision at 20.  The Court disagrees.

The education of a disabled child should take place in the least restrictive environment.  *See* 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent

appropriate, children with disabilities . . . are [to be] educated with children who are not disabled . . . .").  "While every effort is to be made to place a student in the least restrictive environment, it must be the least restrictive environment which also meets the child's IEP goals." *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1468 (9th Cir. 1996).  In determining the least restrictive environment, this Court considers the following four factors:  "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [Student] had on the teacher and children in the regular class; and (4) the costs of mainstreaming [Student]." *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir. 1994).

Plaintiffs have failed to show that the DOE did not adequately consider these factors in placing Student with nondisabled peers for one elective and recess.  Resp. Ex. 9 (December IEP) at 000141.  The special education teacher explained that the IEP team discussed "the whole continuum for [Student] going through mainstream, inclusion or partial inclusion, down to resource room or a partial resource room, and then to a fully[] self[-]contained [classroom]."  Hearing Tr. Vol. 2 at 361:21–25; *accord id.* Vol. 3 at 475:7–12.  At the same time, the IEP team was aware of Student and Parents' desire for Student to get a high school diploma and the need "to maintain a course of study for achievement of a high school diploma."  Resp. Ex. 9 (December IEP) at 000129.  With that ultimate goal

in mind, the IEP team discussed the benefits of placing Student in electives with

nondisabled peers.  Dr. Post explained that, "at first we had said two electives

[with nondisabled peers.]  The parents indicated that he could not handle two

electives, and so we had said okay, one elective and I believe also recess."

Hearing Tr. Vol. 3 at 475:19–23.  Plaintiffs have not rebutted this point and the

Court agrees with the Hearings Officer that the evidence indicates that the

determination to place Student in only one elective and recess with nondisabled

peers was the wish of the Parents as they expressed it to the rest of the IEP team.[1]

This was an appropriate compromise for the IEP team to reach, and one which the

Court declines to second-guess.

Moreover, Student's placement was not immutable.  The special

education teacher testified that the IEP could be revised based on how Student was

performing in the placement.  Hearing Tr. Vol. 2 at 363:10–19.  Student was

coming from Variety, where he had no exposure to nondisabled peers and thus no

inclusion opportunities.  However, there was also a recognition that Student's

performance could change and his IEP could be adapted accordingly.  *See* Resp.

Ex. 16 (Dec. 12, 2011 Prior Written Notice) at 000168 (stating that the placement

in one elective and recess with nondisabled peers "represents an appropriate

transition from a fully self[-]contained . . . setting.  Increased participation will be

---

[1] This evidence also undermines any challenge by Plaintiffs to Student's placement with other disabled students for core classes, lunch, field trips, and assemblies.

considered as [Student] continues to improve his coping skills"). The Court thus determines that the December IEP placed Student in the least restrictive environment to meet his IEP goals.

### III.   **The DOE Did Not Predetermine Placement and Appropriately Addressed Transition**

Plaintiffs contend that the DOE did not address or investigate Parents' concerns about the transition from Variety to Ilima and did not properly consider the harmful effects of placement at Ilima. The DOE counters that Student's transition was planned thoughtfully and methodically and that any behavioral issues occurring during the transition were neither extreme nor extensive and were, in any event, addressed and accounted for. The Court concludes that Plaintiffs have failed to establish that the DOE either predetermined placement or failed to consider the effects of Student's transition.

Plaintiffs have not satisfied their burden of showing that the DOE disregarded Parents' concerns regarding the transition of Student. In fact, the evidence indicates that Parents had ample opportunity to express their concerns regarding the impact of transition and placement at Ilima, and that these concerns were addressed. The IEP team, including Parents, held monthly transition meetings during which any issues raised by Parents were addressed, including any

allegations of the harmful effects of transition.[2]  Decision at 6 ¶¶ 34–35; Hearing Tr. Vol 2 at 342:18–25.  Moreover, Parents were scheduled to receive parent training sessions with the DOE for four hours a month, where they would have been able to further report any issues with Student's transition.  There were some months when Parents were too busy and thus chose not to meet with the DOE for such training; however, in the last monthly meeting in October 2011, Parents reported that there were "no behavior issues . . . involving [Student] either in the home(s) and community setting lately."  Resp. Ex. 23 (DOE Monthly Parent Education Report) at 000576.

Parents also had opportunities to emphasize behavioral and other transition concerns in the behavioral chart they were asked to complete by the DOE special education teacher and in the parent rating scale provided to them by Dr. Post as part of the EBA.  Parents, however, did not return either, let alone express specific concerns therein that the DOE could address.  Resp. Ex. 22 (Sept. 8, 2011 e-mail) at 000382; Resp. Ex. 22 (Dec. 5, 2011 e-mail string) at 000445; Hearing Tr. Vol 3 at 472:18–473:2.  This evidence is contrary to Plaintiffs' position now on appeal that the DOE did not listen to or investigate parental concerns and that the DOE predetermined placement.

---

[2] The transition meetings were held on a monthly basis from the time that Student's placement was changed to Ilima in April 2011.  Answering Br. 28–30.

Further, the evidence supports the Hearings Officer's conclusion that the transition planned for Student was developed "to slowly and methodically transfer Student from the private school to the home school" and that the transition considered the possible harmful effects on Student.  Decision at 22.  The evidence indicates that the transition plan was adjustable and was revisited at least on a monthly basis between the time that Student's placement at Ilima was agreed upon in April 2011 and the December IEP meeting.  Hearing Tr. Vol 1 at 146:21–25; Decision at 6 ¶¶ 34–35.

Plaintiffs acknowledge that the DOE conducted an EBA of Student immediately prior to the December IEP meeting, but emphasize that the EBA was lacking because Dr. Post did not interview Student, Parents, or other individuals with direct knowledge of Student's behaviors.  While the efficacy of the EBA would have likely been improved by gathering further data through additional interviews, the Court notes that Plaintiffs have not established that this ultimately resulted in a deficient report.  In other words, Plaintiffs have not satisfied their burden of establishing that Dr. Post was incorrect in her conclusion that Student did not have any types of behaviors or emotional deficits that would be a cause for concern in transitioning from Variety to Ilima.[3]  Moreover, at least as to Parents,

---

[3] In fact, as stated above, as of October 2011, Parents reported that Student was not having any behavioral issues associated with the transition.

Dr. Post attempted to obtain data in the form of the parent rating scale, but Parents declined to participate.  Hearing Tr. Vol 3 at 472:18–473:2.

The EBA, and the cumulative effort of the IEP team up until the December IEP meeting, demonstrate that the DOE addressed on several occasions the potential needs of, and harmful effects to, Student as a result of transition.  As a result, there was no denial of FAPE.  *Cf. Carrie I. v. DOE*, 869 F. Supp. 2d 1225, 1240 (D. Haw. 2012) (finding a denial of FAPE where, among other things, there was "no evidence that the IEP team specifically discussed [Student's] behavioral problems. . . . [or] how [the DOE school] would deal with those behaviors" during transition).

## CONCLUSION

The Administrative Hearings Officer's October 26, 2012 Decision is hereby AFFIRMED.

IT IS SO ORDERED.

DATED:  HONOLULU, HAWAIʻI, February 5, 2014.



_____
Derrick K. Watson
United States District Judge